# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Shawn Slaven and Julie Slaven, individually and
as parents and next friends for C.S., A.S., and J.S.,

                Plaintiffs,

      v.

Dan Engstrom, Human Services and Public Health
Department for Hennepin County, in his official
capacity as the Director or his successor; Hennepin
County, a governmental entity within the State of
Minnesota; Donothan R. Bartley, in his official
capacity as a social worker for the Hennepin County
Human Services and Public Health Department or
his successor; and Jamie L. Cork, in her official
capacity as an Assistant County Attorney for
Hennepin County or her successor,

                Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 11-1632 ADM/JJK

_____

Erick G. Kaardal, Esq., and William F. Mohrman, Esq., Morhman & Kaardal, P.A., Minneapolis,
MN, on behalf of Plaintiffs.

Daniel P. Rogan, Esq., and Daniel D. Kaczor, Esq., Hennepin County Attorney's Office, Minneapolis,
MN, on behalf of Defendants.

_____

## I.  INTRODUCTION

On December 16, 2011, the undersigned United States District Judge heard oral arguments on

Plaintiffs Shawn Slaven and Julie Slaven's (the "Slavens") Motion for Summary Judgment [Docket No.

13] and Defendants Hennepin County, Dan Engstrom ("Engstrom"), Donothan R. Bartley ("Bartley"),

and Jamie L. Cork's ("Cork") Motion for Summary Judgment [Docket No. 24].  For the reasons set

forth below, Defendants' (Engstrom, Hennepin County, Bartley, and Cork are collectively

"Defendants") motion is granted, and the Slavens' motion is denied.

## II. BACKGROUND[1]

The Slavens are the parents of minor children C.S., A.S., and J.S, and reside in Plymouth, Minnesota.  Compl. [Docket No. 1] ¶¶ 6 8.  On August 18, 2009, Julie Slaven was carrying C.S., then two-months old, in his car seat up the steps to the family home when C.S. accidentally fell out of the seat and hit the ground.  Oct. 5, 2011 Decl. of Julie Slaven ("Julie Slaven Decl.") [Docket No. 17] ¶ 6.  Julie Slaven called 911 and although C.S. did not have any external injuries, he was taken to the hospital as a precautionary measure.  Id. ¶¶ 7 9.  In addition to the  ambulance personnel, police also arrived on the scene, called Shawn Slaven, and stayed with the other children until Shawn Slaven arrived.  Id. ¶¶ 8 9.

At North Memorial Hospital in Robbinsdale, Minnesota, C.S. underwent a computed tomography scan ("CT scan") of his head, was kept overnight for observation, and had a second CT scan the following morning.  See Oct. 5, 2011 Decl. of Shawn Slaven ("Shawn Slaven Decl.") [Docket No. 18] ¶¶ 7 8.  The CT scans revealed chronic blood in C.S.'s bilateral frontal lobes, an injury not consistent with a fall from the car seat.  Nov. 1, 2011 Decl. of Donothan R. Bartley ("Bartley Decl.") [Docket No. 28] Ex. F at HC-SLA00102.

Based on that finding, on August 20, 2009, North Memorial Hospital filed a report of suspected child abuse with Hennepin County.  Id. Ex. A.  That same day, C.S., still in the hospital,

---

[1] On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party.  Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).  As both parties have moved for summary judgment, any disputed facts are noted.

underwent a retinal scan.  Id. Ex. C at HC-SLA00130.  Also on August 20, 2009, Dr. Mark Hudson,

a Board-Certified Child Abuse Pediatrician, was contacted to examine C.S. and review the CT scans

and retinal scan.  Nov. 1, 2011 Decl. of Dr. Mark Hudson ("Hudson Decl.") [Docket No. 30] ¶ 4.

Dr. Hudson's report noted that the results of the diagnostic scans were unusual and concerning.

Hudson Decl. Ex. A at HC-SLA00090.  In concluding his report, Dr. Hudson stated, "Based on the

medical findings there is reason to be quite concerned that the history does not account for the medical

findings and [C.S.'s] ongoing safety must be a consideration.  All of that being said there is no single

finding here diagnostic of non-accidental injury."  Id.

Based on the report of suspected child abuse, Defendant Bartley, a social worker with

Hennepin County, then opened a child protection investigation.  Bartley Decl. Ex. L HC-SLA00112.

Bartley and Detective Molly Lynch ("Lynch") of the Plymouth Police Department interviewed the

Slavens.  Bartley Decl. ¶ 10.  Dr. Hudson was also interviewed and he informed them that a retinal

hemorrhage, found in C.S., may be caused by shaking, and further stated that the Slavens had not

consented to a bone scan for fear of excessive radiation.  Bartley Decl. Ex. C at HC-SLA00134.  Julie

Slaven avers Lynch used high-pressure tactics to induce her to consent to a bone scan, telling her failure

to consent would result in a middle-of-the-night raid of her home and seizure of her children.  Slaven

Decl. ¶ 17.

On the afternoon of August 20, 2009, based on the lack of a bone scan and the findings of Dr.

Hudson, Lynch placed C.S. on an emergency "72-Hour Police Health and Welfare Hold."  Bartley

Decl. Ex. I.  Under the express terms of the hold, the Slavens were prohibited from seeing C.S. except

for feeding times with supervision.  Id.

3

The next day, August 21, 2009, Bartley and Lynch continued their investigation.  They interviewed the Slavens' other children, without anyone else present, in the home of the children's maternal grandparents Marjorie and Stanley Leuthner (the "Leuthners"), with whom the children were staying while their parents were with C.S. at the hospital.  Bartley Decl. Ex. C at HC-SLA00137  38.  Also that day, C.S. underwent a bone scan, to which the Slavens had eventually consented.  Julie Slaven Decl. ¶ 18.  That afternoon, Bartley handed Julie Slaven a handwritten note that stated "Tuesday, August 22, 2009 Juvenile Justice Center . . . Stop by front desk if you want to apply for a PD (public defender)."  Julie Slaven Decl. Ex. 1.  August 22, 2009 was actually a Saturday, and a Emergency Protective Custody Hearing ("EPC Hearing") was scheduled for Tuesday, August 25, 2009 at the Juvenile Justice Center.

Under Minnesota law, when a peace officer takes custody of a child, as Lynch did with the "72-Hour Police Health and Welfare Hold," a hearing must be held within seventy-two hours, excluding weekends and holidays, to determine whether the child should remain in protective custody.  Minn. Stat. § 260C.178, subd. 1(a).  Additionally, a child cannot remain in custody unless a petition for a child in need of protection or services has been filed or a temporary extension is granted after a hearing finding domestic abuse perpetrated by a minor.  Minn. Stat. § 260C.176, subd. 2(b).  The substance of an EPC Hearing is to determine whether the petition filed states a prima facie case that (1) a child protection matter exists and (2) release of the child to his or her parent would result in immediate endangerment of the child.  Minn. R. Juvenile Protection P. 30.08, subd. 1.

On August 25, 2009, the Slavens personally appeared represented by counsel at the EPC Hearing.  Nov. 2, 2011 Decl. of Jamie L. Cork [Docket No. 29] ("Cork Decl.") Ex. B ("EPC Hearing

4

Tr.") at HC-SLA00336. Defendant Cork, an assistant county attorney, appeared along with Defendant Bartley, who was the investigating social worker, and Sarah Storm ("Storm"), who had been assigned as the ongoing social worker for the case. Id. at HC-SLA00337. A guardian ad litem for the children also appeared. Id. The proceedings were held before Judge Kathryn Quaintance. Id. at HC-SLA00336. At the EPC Hearing, the Slavens were served for the first time with a summons and petition. Julie Slaven Decl. ¶ 24. In addition to naming C.S., the Slavens' other children, A.S. and J.S., were also subjects of the petition. Cork Decl. Ex. A ("Petition") ¶ 1. The Petition recited the facts discussed above, including the Slavens' account of the events and Dr. Hudson's report that "there is not a single finding here diagnostic of non-accidental injury." See generally Petition. However, the Petition omitted the fact that the Slavens had allowed a bone scan after initially refusing    instead, it stated "Mr. and Mrs. Slaven would not agree to a Skeletal Survey." Petition ¶ 6.

At the EPC Hearing, Cork requested that all three children be placed out of their home with their maternal grandparents, the Leuthners. EPC Hearing Tr. at HC-SLA00338  40. Judge Quaintance provided the Slavens with an opportunity to make an opposing case, but they did not call any witnesses or present any other evidence. A reference was made to an *in camera* discussion about the futility of challenging the veracity of the Petition. See id. at HC-SLA00347 ("I know we discussed this at length in chambers and the Court was very clear that you didn't want us to be trying the facts in front of you here today."). Therefore, the Slavens confined their argument to asserting the Petition itself was intrinsically inconsistent and did not support a prima facie finding of a child in need of protection or services. Id. at HC-SLA00347  49. They also urged an alternative placement arrangement for the children suggesting the Leuthners move into the Slavens' home, Julie Slaven move out (but Shawn

Slaven would remain), and the Leuthners supervise visitation.  Id. at HC-SLA00349  52.

Judge Quaintance ruled that a prima facie case existed and that the health, safey, and welfare of the children would be in imminent harm and danger if they returned to the care of Julie Slaven.  Id. at HC-SLA00354.  Judge Quaintance adopted the Slavens' proposed placement, and ordered the children to remain in their home under the care of the Leuthners with Julie Slaven to reside out of the home, and for the Slavens' visitation to be supervised by the Leuthners.  Id. at HC-SLA00353  54.

The hearing then turned to discussion of future proceedings.  Judge Quaintance proposed a pre-trial hearing date of September 17, 2009, but due to the Slavens' and their attorney's schedules the date of September 21, 2009 was selected.  Id. at HC-SLA00357  58.  A trial date was set for Judge Quaintance's "trial block" that allotted her days for trial beginning on October 26, 2009 and ending October 29, 2009.  Id. at HC-SLA00359.  October 26, 2009, was sixty-two days after the EPC Hearing.  The Minnesota Rules of Juvenile Protection Procedure require that a trial be held within sixty days of an EPC Hearing or another hearing (not applicable here) known as an admit/deny hearing.  Minn. R. Juvenile Protection P. 39.02, subd. 1.[2]

After the EPC hearing, the Slavens aver Hennepin County "did not perform any further investigation of the August 18th accident."  Pls.' Mem. of Law in Supp. of Mot. for Summ. J. [Docket No. 15] 9.  However, the record reflects that Storm conducted two separate home visits prior to the pre-trial hearing.  Nov. 2, 2011 Decl. of Sarah Storm [Docket No. 31] ("Storm Decl.") Ex. A at HC-

---

[2] During this same time period, Julie Slaven was also subject to parallel administrative proceedings before the Hennepin County Human Services & Public Health Department.  Julie Slaven Decl. ¶ 31.  However, those administrative hearings are not alleged to form the basis of any of the claims here.  See generally Compl.

SLA00228, HC-SLA00231.  At the pre-trial hearing, based on the home visits and the Slavens'

agreement to abide by a "case plan," the prosecution recommended the children transition back into the

care of their parents and converted the trial date into another pre-trial hearing.  Id. at HC-SLA00233.

By Order dated September 28, 2009, Judge Quaintance allowed Julie Slaven to return home, subject

to continued supervision by the Leuthners, and allowed her two hours a day of unsupervised time with

the children.  Cork Decl. Ex. E.  Further, after the pre-trial hearing both Slavens underwent

professional parenting assessments.  Storm Decl. Exs. C, D.   The parenting assessors concluded that

C.S.'s injury was accidental and recommended that the children be gradually returned to the care of the

Slavens. Storm Decl. Ex. C at HC-SLA00063  64, Ex. D at HC-SLA00081, HC-SLA00043  44.

By Order dated October 12, 2009, Judge Quaintance ordered that supervision of the Slavens

be gradually phased out with no supervision beginning the week of October 26, 2009.  Cork Decl. Ex.

F.  That same day the second pre-trial hearing took place and Judge Quaintance ordered the case be

continued for thirty days at which time the parties could request dismissal without adjudication.  Cork

Decl. Ex. G at HC-SLA00367  68, Ex. H.  At that hearing, Cork stated "Based upon the observations

it appears that the children are safe in the Slaven's [sic] care, and that the incident that occurred . . .

was accidental."  Cork Decl. Ex. G at HC-SLA00366.  By Order dated December 7, 2009, Judge

Quaintance dismissed the case and terminated juvenile court jurisdiction.  Cork Decl. Ex. I.

On June 22, 2011, the Slavens initiated the present lawsuit, alleging that the Defendants'

actions related to the child protection case violated their due process rights.

## III.  DISCUSSION

**A.      Standard of Review**

Both Plaintiffs and Defendants have moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.  Rule 56(a) provides that summary judgment shall issue "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing Fed. R. Civ. P. 56(c));[3] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986) (same); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (same).  On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party.  Ludwig, 54 F.3d at 470.  The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial."  Krenik v. Cnty. of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

**B.      42 U.S.C. § 1983**

The Slavens assert their claims pursuant to 42 U.S.C. § 1983.  Section 1983 "provides a remedy for deprivations of rights secured by the Constitution and laws of the United States when that deprivation takes place 'under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . .'"  Lugar v. Edmondson Oil Co., 457 U.S. 922, 924 (1982) (quoting 42 U.S.C. § 1983).

The Slavens assert their claims against the individual Defendants in their official capacities only.

---

[3] The summary judgment standard was previously located in Rule 56(c).

Under § 1983, a defendant may be sued in his or her individual capacity or his or her official capacity.

"Personal-capacity suits seek to impose personal liability upon a government official for actions he

takes under color of state law."  Kentucky v. Graham, 473 U.S. 159, 165 (1985) (citation omitted).

"Official-capacity suits, in contrast, 'generally represent only another way of pleading an action against

an entity of which an officer is an agent.'"  Id. at 165  66 (citing Monell v. New York City Dept. of

Social Servs., 436 U.S. 658, 690, n.55 (1978)).   Municipalities and other local government units, like

Hennepin County, may be liable under § 1983 only where a *policy or custom* of that entity caused the

alleged constitutional violation.  Monell, 436 U.S. at 690  92 (emphasis added).  Stated another way, a

local government is liable under § 1983 only where its policy or custom is the "moving force" behind a

constitutional violation.  See id. at 694  95.

The constitutional violation alleged by the Slavens is that their due process rights, guaranteed to

them by the Fourteenth Amendment, were violated by Defendants during the prosecution of the child

protection case.  The Due Process Clause of the Fourteenth Amendment "provides the familiar

guarantee of fair procedures, prohibiting the deprivation of life, liberty, or property by a State without

due process of law."  Flowers v. City of Minneapolis, Minn., 478 F.3d 869, 872  73 (8th Cir. 2007).

The "liberty" protected by the Due Process Clause includes the right of parents to make decisions

concerning the care, custody, and control of their children.  Troxel v. Granville, 530 U.S. 57, 65  66

(2000).   "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful

time and in a meaningful manner.'"  Matthews v. Eldridge, 424 U.S. 319, 333 (1976) (citing Armstrong

v. Manzo, 380 U.S. 545, 552 (1965)).

Because due process requires an opportunity to be heard at a meaningful time, a pre-

deprivation hearing must be provided except in exigent situations requiring quick government action or when the deprivation was the result of a "random and unauthorized act" and a pre-deprivation hearing is "not only impracticable, but impossible." Moore v. Warwick Pub. Sch. Dist.No. 29, 794 F.2d 322, 327  28 (8th Cir. 1986).  However, if a pre-deprivation hearing is not required due to exigent circumstances, a post-deprivation hearing must be promptly provided. Id. at 327 (citations omitted).

Further, what process is due is flexible and depends on the demands of the particular situation. Matthews, 424 U.S. at 334 (quotation omitted).  In deciding what process is due, courts consider three factors: (1) the private interest that will be affected by the official action, (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards, and (3) the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. Id. at 335 (citation omitted).

The Slavens argue that Defendants' actions, specifically the timing and notice of the EPC hearing and with the timing of the October 26, 2009 trial, violated their constitutional rights.  Because the issues related to the timing of trial are more facile, they will be addressed first.

### 1.    Timing of CHIPS Trial

Count II of the Slavens' Complaint asserts a § 1983 claim based on the scheduling of their trial, which was to begin at least sixty-two days after the EPC Hearing.  At this juncture, a more comprehensive overview of the child protection scheme in Minnesota is required.  It has been long recognized that states may intrude on families in order to protect children's well-being. SooHoo v. Johnson, 731 N.W.2d 815, 822 (Minn. 2007) (citing Prince v. Massachusetts, 321 U.S. 158, 166

(1944)).  The purpose of the trial (the "CHIPS trial") that was set for Judge Quaintance's October 26,

2009 trial block was to adjudicate whether the allegations in the Petition proved by clear and

convincing evidence that the Slavens' children were in need of protection or services.  See Minn. Stat.

§ 260C.163, subd. 1.  Under Minnesota law, a child may be in need of protection or services for a

variety of reasons that threaten his or her well-being, such as abandonment, neglect, abuse, truancy,

criminality, or sexual exploitation.  Minn. Stat. § 260C.007, subd. 6.  Under the rules of juvenile court

procedure in Minnesota, a CHIPS trial, i.e. a trial regarding the adjudication of a child in need of

protection or services, must be held within sixty days from the earlier of an EPC Hearing or another

hearing known as an "admit/deny hearing."  Minn. R. Juvenile Protection P. 39.02, subd. 1(a).

However, a continuance may be granted upon motion of the court or the parties if necessary for

protection of child, accumulation or presentation of evidence, to protect the rights of a party, or for

other good cause.  Minn. R. Juvenile Protection P. 39.02, subd. 2.

The effect of adjudicating a child to be in need of protection or services is that the child will be

ordered into a restrictive placement  at his or her usual home but under protective supervision, with a

relative, with a noncustodial parent, or in foster care.  Minn. Stat. § 260C.201, subd. 1.  In addition,

when a child is placed outside of his or her home, the court will order a "case plan" that, among other

things, identifies steps parents must take to be allowed to reunite with their child.  Minn. Stat. §

260C.201, subd. 6; see also Minn. Stat. § 260.212, subd. 1.  If a child is adjudicated in need of

protection and services and placed in foster care, another hearing must be held, within six months for

children under eight and within twelve months for others, to determine whether the child should be

returned to his or her parents' care, or if legal and physical custody of the child should be transferred,

11

or if the parental rights of the parents should be terminated.  Minn. Stat. § 260C.201 subds. 11  11a.

Prior to and pending a CHIPS trial, however, a child subject to a petition for child in need of protection

or services may be placed in foster care or with a noncustodial parent under conditions.  Minn. Stat. §

260C.178, subd. 1(c).

The Slavens argue that the sixty-two day delay between the EPC Hearing and the scheduled

trial was unconstitutionally long.  The Slavens' argument fails, however, because they have identified no

policy or custom of Hennepin County that was the "moving force" behind the interim delay between the

CHIPS trial and EPC Hearing.  Rather, the evidence of record is that the policies and customs of the

State of Minnesota and its judicial branch were the "moving force" behind the delay.

The circumstances which may cause a municipality or local government to be held liable under

§ 1983 for implementing state law has been the subject of some debate among federal appellate courts.

Compare Bockes v. Fields, 999 F.2d 788, 791 (4th Cir. 1993) (holding county not liable under §

1983 as a matter of law where county had no "policy making authority," but only "bounded, state-

conferred discretion" to discharge employee) with Vives v. City of New York, 524 F.3d 346 (2d Cir.

2008) (noting that municipality is liable under § 1983 if it makes a "conscious choice" to enforce an

unconstitutional statute that it is authorized, but not required, to enforce); see also Bethesda Lutheran

Homes & Servs., Inc. v. Leean, 154 F.3d 716, 718  19 (7th Cir. 1998) (ruling that § 1983 liability will

attach to a municipality for following state policies and regulations only where municipality has discretion

to choose whether or not to implement them).  This Court's binding appellate authority, the U.S. Court

of Appeals for the Eighth Circuit, has not yet decided this issue.  Nonetheless, courts generally agree

that municipalities and local governments cannot be liable under § 1983 for enforcing a state law when

it is required to do so.  See N.N. ex rel. S.S. v. Madison Metro. Sch. Dist., 670 F. Supp. 2d 927, 934 937 (W.D. Wisc. 2009) (collecting cases and discussing various approaches).  Similarly, municipalities and local governments are not liable for judicial decisions of the state.  See Davis v. Tarrant Cnty., Tex., 565 F.3d 214, 227 (5th Cir. 2009) (dismissing claims against county on basis that under Texas law local judges are state officials and not local government officials); Johnson v. Turner, 125 F.3d 324, 335 (6th Cir. 1997) (holding that county could not be liable for § 1983 claims premised on memorandum authored by juvenile court judge because there was no county policy; functions of juvenile court were established by state law).  Therefore, under any standard, the timing of the CHIPS trial cannot be attributed to Hennepin County or its officials.

Under Minnesota law, child protection matters are tried before the courts of Minnesota.  Minn. Stat. § 260C.101, subd,. 1 ("The juvenile court has original and exclusive jurisdiction in proceedings concerning any child who is alleged to be in need of protection or services . . . .").  Inherent in judicial authority is the authority of the court to set its own schedule.  See Landis v. N. Am. Co., 299 U.S. 248, 254 (1936) ("[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort . . . .").  Therefore, Hennepin County, as a matter of law, has no policy making authority whatsoever with respect to the timing of a CHIPS trial, can make no "conscious choice" about when it will be scheduled, and has no discretion to deviate from the court-imposed schedule.  Hennepin County could not have exercised discretion and somehow provided the Slavens with an extra-judicial trial on the merits.  To do so would be contrary to Minnesota law, which granted exclusive jurisdiction over this matter to the state court. Nor could Defendant Cork have forced Judge Quaintance to schedule an earlier date, particularly

13

where the Slavens, through counsel, had rejected an earlier proposed date due to their attorney's schedule.   Therefore, none of Defendants were the "moving force" behind a constitutional violation related to the timing of the CHIPS trial, and Defendants are entitled to summary judgment in their favor with respect to Count II of the Complaint.

Furthermore, even if Defendants were to be held liable for the decisions of Judge Quaintance and the Minnesota Judiciary, scheduling a trial on the merits sixty-two days after an EPC Hearing, and some sixty-seven days after an initial "hold," is not unconstitutional.  What process is due in a given situation depends on balancing the relative interests at stake and possible alternatives.  Matthews, 424 U.S. at 334 35.  In balancing the interests at stake, Matthews expressly directs courts to pay particular attention to the risk of an erroneous deprivation of liberty.  Id.  In conducting the balancing analysis here, the Court will draw from the criminal context as an analogous situation with liberty interests at stake to delineate what process is generally sufficient.  See Jordan by Jordan v. Jackson, 15 F.3d 333, 349 51 (4th Cir. 1994) (drawing analogy between emergency removal of child and adult arrest and allowing "incremental" increase in time before judicial review of removal of child because the associated deprivation of liberty was "less comprehensive in scope than that resulting from an arrest"); see also In re RGB, 29 P.3d 1066, 1114 15 (Hawaii 2010) (noting that nearly every state has determined that parents faced with parental rights termination proceedings are afforded the right to counsel and some have drawn analogy to criminal law).

In the criminal context, after arrest and arraignment, it is not uncommon for a defendant to wait months before receiving a full trial on the merits.  It was this concern with delay that motivated Congress to pass the Speedy Trial Act (the "Act") in 1974.  Under the terms of the Act, a criminal

defendant must be brought to trial no more than seventy days after the later of his or her indictment or the date the defendant appears before a judicial officer of the court in which the charge is pending, barring certain exceptions.  18 U.S.C. § 3161(c)(1).  It is well established that the Act affords criminal defendants constitutionally sufficient process, despite requiring them to wait up to seventy days before they are able to fully challenge the veracity of the allegations against them and to have a full-blown trial on the merits of the claims against them.  Likewise, in light of the Act and the Matthews factors, Minnesota's juvenile court procedures, which allow for up to a sixty-day delay before a parent may fully challenge the veracity of the allegations against them and have a full-blown trial on the merits, are constitutional.  Just as it is lamentable that innocent criminal defendants must await trial in jail or on bail subject to intrusive monitoring and constrained liberty, it is lamentable that innocent parents and their children may have to wait sixty days in a tumultuous world of uncertainty, compromised liberty to interact with each other, and heightened scrutiny.  Given no other reasonable alternatives, it is a necessary cost of the protection of children by the judicial system.  The search of truth is aided by investigation  some reasonable delay is beneficial and necessary to the search for truth, it allows facts to be gathered and issues to be refined.  It is a delicate balance, but it is not a balance that has been set so as to violate due process and its demands of fundamental fairness here.  On this independent basis, Defendants are entitled to summary judgment on Count II as well.

The Slavens attempt to avoid this result by arguing that the CHIPS trial was, in fact, their first hearing regarding any of their children, and some hearing must be provided either prior to a deprivation or within days of a deprivation.  See, e.g., Swipies v. Kofka, 419 F.3d 709, 715 (8th Cir. 2005) (holding that seventeen days between removal of child and hearing was not constitutionally sufficient

process).  However, the undisputed facts are that a EPC Hearing was held within days of any liberty deprivation regarding the custody of C.S. and prior to any liberty deprivations regarding A.S. and J.S. At oral argument, the Slavens' counsel argued that counting the EPC Hearing as a "hearing" was tantamount to "compounding fallacy upon fallacy."  However, the timing of the CHIPS trial poses no legally significant issue as long as *some* constitutionally sufficient post-deprivation hearing, including a hearing in the form of something less than a full-blown trial on the merits, was provided promptly to the Slavens.  The essence of the Slavens' claims here is not that the CHIPS trial was impermissibly delayed, indeed it was their own attorney that caused some of the delay, but rather that the EPC Hearing was not really a "hearing" because it did not provide a *meaningful* opportunity to be heard. This is precisely the same argument offered in support of Count I of the Complaint, and to which the Court now turns.

### 2.    EPC Hearing

Count I of the Complaint asserts a claim under § 1983 premised on the events surrounding the EPC Hearing.  Specifically, the Slavens aver their due process rights were violated because they did not receive adequate notice of the EPC Hearing and because the EPC Hearing was not the *meaningful* hearing due process requires.

The context of the EPC Hearing is highly relevant  it is an adversarial proceeding between Hennepin County and parents, here the Slavens, presided over by a state court judge.  In that context, of course, some decisions are wholly that of the state judge, and in light of cases such as <u>Bockes</u>, <u>Vives</u>, and <u>Bethesda</u>, discussed above, Hennepin County cannot be liable for judicial decisions. Therefore, it is necessary to parse which acts are those of Minnesota's judicial branch and which are

those of Hennepin County.

Under Minnesota law, notice of child protection proceedings is a function expressly delegated to the state courts. Minn. Stat. § 260C.152; Minn. R. Juvenile Protection P. 23.02.   In cases of emergency child protection in particular, Minnesota's procedural rules allow notice to be given through "whatever method is available" and notice is to be given by the "court administrator, or designee." Minn. R. Juvenile Protection P. 32.03, subd. 2.  Here, Defendant Bartley gave notice to the Slavens. Bartley, however, was not acting in his official capacity as a social worker with Hennepin County. Rather, he was acting as designee of the courts.  Acts done at the direction of the judiciary are entitled to judicial immunity.  See Robinson v. Freeze, 15 F.3d 107, 109 (8th Cir. 1994) (noting that officials are entitled to absolute immunity for acts they are required to do under court order or at a judge's direction) (quoting Rogers v. Bruntrager, 841 F.2d 853, 856 (8th Cir. 1988)).

Furthermore, even if judicial immunity were no bar, the Slavens were not denied due process. The Slavens had actual notice of the hearing  they appeared and were represented by counsel.  Cf. Hulstine v. Morris, 819 F.2d 861, 864 (8th Cir. 1987) ("Due process requirements may be satisfied if a defendant receives actual notice of the charges against him, even if the indictment or information is deficient.").  The aspects of the EPC Hearing that may have been a surprise to them were (1) that the hearing also concerned their other children, A.S. and J.S., in addition to C.S., and (2) that they could not present evidence on their own behalf.  Nonetheless, the juvenile courts of Minnesota have an internal mechanism to correct surprises at an EPC Hearing  a continuance.  See Minn. R. Juvenile Protection P. 30.01, subd. 2.  The Slavens did not seek a continuance.  If the Slavens suffered any prejudice from lack of notice, they did not seek relief during the hearing.  They cannot now seek

17

damages for lack of process when they did not avail themselves of the process available.  See Alvin v. Suzuki, 227 F.3d 107, 116 (3d Cir. 2000) ("In order to state a claim for failure to provide due process, a plaintiff must have taken advantage of the processes that are available to him or her, unless those processes are unavailable or patently inadequate.").

Turning now to the substance of the EPC Hearing and whether the hearing was meaningful, it is necessary to again focus on the actions undertaken by Hennepin County.  Many of the Slavens' allegations concern the standard of review at the EPC Hearing, and their resulting inability to submit evidence on their own behalf.  Compl. ¶¶ 16, 32  34.  Minnesota court policy is that the presiding judge at an EPC Hearing considers the allegations in the Petition to determine whether they state a prima facie case of a child in need of protection or services.  Minn. R. Juvenile Protection P. 30.08, subd. 1. Further, the presiding judge also considers whether the children are in imminent threat of harm by considering only the Petition and whether it states a prima facie case.  Id.  On that basis, the Slavens aver the hearing was not meaningful because they could not cross-examine witnesses, submit evidence, or otherwise challenge the veracity of the allegations in the Petition.

The evidence of record is that the policy to consider only whether the Petition states a prima facie case is that of Minnesota, not Hennepin County.  The policy of Minnesota, followed by Judge Quaintance, is to consider only the allegations within the four corners of the Petition, and the Hennepin County Attorney's Office has no policy making authority or discretion to alter that policy.  Therefore, to the extent the Slavens' § 1983 claim is premised on their inability to submit evidence, cross-examine witnesses, or otherwise challenge the merits of the allegations against them, their claim fails.  Hennepin

18

County is not liable for the actions of Judge Quaintance.[4]

The allegations within the Petition were wholly the result of decisions made by Defendant Cork. County attorneys enjoy virtually unfettered discretion in drafting their own pleadings. On that basis, if the pleadings are fraudulent or misleading, they may well violate the adverse party's due process rights. See, e.g., Brokaw v. Mercer Cnty., 235 F.3d 1000, 1020 (7th Cir. 2000) ("[N]o

---

[4] Because Hennepin County is not liable for the official policy of the State of Minnesota to consider only whether a petition states (1) a prima facie case of a child in need of protection and (2) a prima facie case that a child is in imminent danger, the constitutionality of that scheme is not before the Court and will not be decided. Nonetheless, the Court is troubled by some aspects of the procedures adopted by Minnesota. Minnesota purports to allow a juvenile court to "admit any evidence . . . that is relevant to the decision of whether to continue protective care . . . or return the child home." Minn. R. Juvenile Protection P. 30.06. Yet, any attempt by parents to admit such evidence is entirely futile because those same rules instruct courts to continue with protective care if it finds "endangerment" exists, which is determined by considering whether the petition makes a prima facie showing of endangerment. Minn. R. Juvenile Protection P. 30.08, subd. 1(b). The Court is not reassured by the fact that the juvenile court's determination is a two step-process. Under the rules, both steps are evaluated on a prima facie basis. Id.

Continuing with the criminal law analogy discussed above, in federal courts after an arrest, the arrestee must be brought before a magistrate "without unnecessary delay." Fed. R. Crim. P. 5(a)(1)(A). For crimes greater than petty offenses, the magistrate must conduct a preliminary hearing, with certain exceptions. Fed. R. Crim. P. 5.1(a). The preliminary hearing is less than a full-blown evidentiary hearing, and certain rules of evidence do not apply, but nonetheless the defendant is permitted to cross-examine adverse witnesses and introduce evidence. Fed. R. Crim. P. 5.1(e). If the magistrate judge finds no probable cause, the defendant is discharged. Fed. R. Crim. P. 5.1(f).

While recognizing the process due in the criminal context is greater than child protection matters because the criminal defendant's liberty interest is greater, see Jordan, 15 F.3d at 349 51, some states have adopted statutory schemes that do allow for consideration of at least some rebuttal evidence submitted by parents or guardians. See, e.g., Fla. Stat. § 39.402(c) ("At the shelter hearing, the court shall . . . [g]ive the parents or legal custodians an opportunity . . . to present evidence."); Ill. Comp. Stat. 405/2 10 ("[A]t the temporary custody hearing, all witnesses present shall be examined before the court in relation to any matter connected with the allegations made in the petition."); Wash. Rev. Code § 13.34.065(2)(b) ("All parties have the right to present testimony to the court regarding the need or lack of need for shelter care."). Whether the use of a prima facie standard deprives litigants of a meaningful hearing, however, requires greater analysis and is not reached on this record. The Court declines to rule on its constitutionality.

matter how much process is required, at a minimum it requires that government officials not misrepresent the facts in order to obtain the removal of a child from his parents.").

The precise extent to which exculpatory information must be included in pleadings is debatable. But clearly, in all cases attorneys have an ethical duty not to mislead the court.  Id.; Minn. R. Professional Conduct 3.3.  Furthermore, unlike "normal" attorneys, prosecutors have heightened duties, including the duty to seek justice.  Minn. R. Professional Conduct 3.8 cmt. 1.  In criminal matters, prosecutors must alert the court, and their adversaries, to exculpatory information.  Minn. R. Professional Conduct at 3.8(d).  Prosecutors must also decline to continue prosecuting a criminal matter if there is insufficient evidence to support a guilty verdict.  Minn. R. Professional Conduct 3.8 cmt. 1 ("A prosecutor has the responsibility . . . to see . . . that guilt is decided upon the basis of sufficient evidence.").

A prosecutor has policy making authority and discretion in deciding what information to include in pleadings.  Therefore, based on those general principles, a plaintiff may have an actionable § 1983 due process violation if a county attorney had a policy or custom of drafting misleading child protection petitions, had a policy or custom of failing to investigate facts (particularly exculpatory facts), or had a policy or custom of persisting in prosecuting child protection matters even after it became apparent that evidence would not support an adjudication of a child in need of protection or services.

However, Defendants are not liable here because whatever deficiencies existed in the pleadings or in the prosecution of the matter, no evidence of record suggests a *policy or custom* of depriving litigants of due process.  That the Petition stated that the Slavens had not allowed a "Skeletal Survey" when in fact they had and the results were negative is of serious concern.  But, no evidence suggests

that Cork or Hennepin County had a policy or custom of misstating facts.  Significantly, the evidence is that Bartley only learned much later that the Slavens had allowed a bone scan, see generally Bartley Decl. Ex. C at HC-SLA00134  44, and the appointed guardian ad litem was unaware whether they had allowed the scan well after the date of EPC Hearing, Storm Decl. Ex. A at HC-SLA00232. Whether the confusion on this issue was due to memory lapse, due to neither the Slavens or the hospital reporting the scan, or due to the failure of Hennepin County's internal reporting is unclear. Nonetheless, no evidence related to a policy or custom that would have caused the omission has been adduced.  Therefore, no liability may attach under Monell and its progeny.  Monell, 436 U.S. at 690  92.

Furthermore, the Slavens' argument that their due process rights were continually violated as their case proceeded, in the face of exculpatory evidence, is unavailing.  As with the drafting of the pleadings, the Slavens' have not adduced any evidence from which to infer Cork or Hennepin County had a policy or custom of persisting to prosecute frivolous child protection matters.  Even more fundamentally, however, the evidence of record is that Cork did advocate dismissing the Petition soon after becoming convinced that C.S.'s injuries were accidental.   Parenting assessments are important evidence in child protection matters, particularly where accident is the defense.  See Storm Decl. Ex. A at HC-SLA00233 (noting that parenting assessments were viewed as important evidence in the Slavens' case).  On September 24 and 25, 2009, the Slavens underwent assessments, and Shawn Slaven's assessor concluded C.S.'s injuries were accidental and both assessors recommended the children return to the care of their parents.  Storm Decl. Exs. C, D.  On October 1, 2009, Storm, the social worker newly assigned to the case, received the assessments and forwarded them to Cork on

21

October 2, 2009.  Storm Decl. Ex. A at HC-SLA00233  34.  That same day, October 2, 2009,

Storm also sent Judge Quaintance a Court Notification Request asking that the children immediately

begin the transition back to the care of their parents and be returned to the care of their parents, without

supervision, by October 26, 2009.   On October 26, 2009, a second pre-trial hearing was held and

Cork requested permission to dismiss the case after a continuance of thirty days.  Cork Decl. Ex. H.

While understanding the Slavens' frustration that Cork did not unambiguously state that she would

dismiss the Petition until more than three weeks after she first received the parenting assessments, and

only then after an additional thirty-day continuance, those delays do not establish a policy or custom of

waiting an unconstitutionally long period of time to dismiss meritless child protection matters. Therefore,

Defendants are entitled to summary judgment on this claim as well.

This result is not intended to suggest that the Slavens' experience with Defendants was not, on

some level, unjust.  However, the basis of the Slavens' claims against Defendants are in their official

capacities under § 1983, and as such Plaintiffs are required to show a county policy or custom was the

"moving force" behind a constitutional violation.  The Slavens have not adduced any evidence that any

arguable constitutional violation caused by Hennepin County, as opposed to the State of Minnesota,

was anything more than a single and isolated incident of what may have been zealous prosecution and

overstatement of facts, rather than a policy or custom of such conduct.

**C.     Declaratory and Injunctive Relief**

In their briefs and at oral argument, Defendants argued that the Slavens do not have standing to

seek declaratory or injunctive relief.  The Slavens have proffered no argument that declaratory or

injunctive relief is warranted, and therefore those claims are dismissed without further discussion.

## IV.  CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY**

**ORDERED** that:

1.     The Slavens' Motion for Summary Judgment [Docket No. 13] is **DENIED**;

2.     Defendants' Motion for Summary Judgment [Docket No. 24] is **GRANTED**; and

3.     All claims in the Complaint [Docket No. 1] are **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  January 30, 2012.

23